1

2

3

4

5

# UNITED STATES DISTRICT COURT

6

## DISTRICT OF NEVADA

7

8   STEVEN LIGUORI, and individual; and BRUNO
    LIGUORI TURQUOISE TRADING, INC., a               )
9   Nevada corporation,                               )
                                                      )
10          Plaintiffs/Counterdefendants,             )        Case No. 2:11-cv-00492-GWF
                                                      )
11   vs.                                              )        **ORDER**
                                                      )
12   BERT HANSEN, an individual,                      )        **Motion for Judgment as a**
                                                      )        **Matter of Law, For New**
13          Defendant/Counterclaimant.                )        **Trial, or Remittitur (#212)**
    ─────────────────────────────────────            )

14

15          This matter is before the Court on Defendant Bert Hansen's Motion for Judgment as a Matter

16   of Law, for New Trial Pursuant to FRCP 59(a), or in the Alternative for Remittitur Pursuant to FRCP

17   59(a) (#212), filed on June 17, 2015.  Plaintiffs filed their Opposition (#220) on July 6, 2015 and

18   Defendant filed his Reply (#227) on July 16, 2015.  The Court conducted a hearing in this matter on

19   July 31, 2015.  Plaintiffs thereafter requested leave to file a supplemental brief which the Court

20   granted.  Plaintiffs filed their Supplemental Brief (#246) on August 19, 2015.  Defendant was

21   granted permission to file a response to Plaintiff's supplemental brief, but he has not done so.

22                                       **BACKGROUND**

23          The original complaint in this action was filed by Plaintiffs Steven Liguori and Bruno Liguori

24   Turquoise Trading, Inc. on April 1, 2011 and was answered by Defendant Bert Hansen on July 8,

25   2011.  Plaintiffs' First Amended Complaint (#78), filed on March 14, 2013, alleged claims for relief

26   against Defendant Hansen for copyright infringement pursuant to 17 U.S.C. §§ 501-505, breach of

27   contract, tortious breach of contract, breach of the implied covenant of good faith and fair dealing,

28   breach of fiduciary duty, and fraud.  The case was tried to a jury from May 4 to May 12, 2015 on

1    Plaintiffs' claims for breach of the parties' Retail Licensing Agreement and copyright infringement.

2    The jury returned a verdict in favor of Plaintiffs on their breach of contract claim in the amount of

3    $1,200,000.00.  The jury also found in favor of the Plaintiffs on their claim for copyright

4    infringement and awarded the maximum allowable statutory damages–$150,000.00.  *See Jury*

5    *Verdicts (#186, #187)*.  Prior to verdict, the parties stipulated that Defendant was entitled to recover

6    $19,000 on his counter-claim for breach of contract.  The Court therefore entered judgment for

7    Plaintiffs on their breach of contract claim in the amount of $1,181,000.00.  The Court also awarded

8    $814,890.00 in prejudgment interest pursuant to the Retail Licensing Agreement which provided for

9    the payment of interest at the rate of 1.5% per month (18% per annum).  *Amended Judgment (#199).*

10   The Court entered judgment for Plaintiffs on their claim for copyright infringement in the amount of

11   $150,000, plus $2,573.01 in statutory interest.[1]  *Id*.

12        According to the evidence presented at trial, Defendant Bert Hansen, who is legally blind, has

13   for many years operated a food store or snack shop concession on federal property at Hoover Dam,

14   Nevada under the auspices of the Nevada Bureau of Services to the Blind and Visually Impaired.

15   The store was formerly known as the "Snacketeria" and was later renamed the "High Scaler Café."

16   Over time, Mr. Hansen's store has been located at various places on the Nevada side of Hoover

17   Dam.  Mr. Hansen pays a percentage of the net profits from the store's operation to the government

18   and keeps the remainder.  Plaintiff Steven Liguori is an artist who, among other things, designs and

19   creates jewelry and sculptures.   Mr. Hansen's and Mr. Liguori's business relationship began in the

20   1990's when Mr. Hansen provided Mr. Liguori with space in his store to sell jewelry items in

21   exchange for one third of the sales price of said items, less sales tax.  After Mr. Hansen's store was

22   relocated to the Hoover Dam parking garage facility in or about 2001, and another location operated

23   by him, the "Spillway Store," was closed by the Government, he no longer had space for Mr.

24   Liguori's jewelry items.  Mr. Liguori obtained space to sell his jewelry in an adjacent store operated

---

[1]The Retail Licensing Agreement also provides that the prevailing party in an action for breach of the agreement shall be entitled to an award of reasonable attorney's fees.  Attorney's fees are also recoverable under the Copyright Act.  Plaintiffs have filed a motion for an award of $631,015.00 in attorney's fees and nontaxable costs of $53,742.47.  *Motion for Attorney's Fees and Nontaxable Costs (#201).*

by Kawana Pohe.  Mr. Pohe was a defendant in this action, but was dismissed prior to trial pursuant to a settlement agreement with the Plaintiffs.

In or about 1995, Mr. Hansen and Mr. Liguori discussed ideas for a sculpture commemorating the laborers who worked on the construction of Hoover Dam.  As a result of those discussions, Mr. Liguori created a two foot tall bronze sculpture called the "Hoover Dam High Scaler" or "High Scaler."  A "high scaler" was a worker who sat in a bosun's chair suspended by ropes along the canyon walls above the Hoover Dam construction site.  The high scaler cleared the sides of the canyon and prepared them for demolition.  Mr. Liguori's "High Scaler" sculpture was based on a contemporary photograph of Hoover Dam worker, Joe Kine, that depicted him suspended in a bosun's chair on the canyon wall.  The Kine photograph is in the public domain.  Although Mr. Liguori's sculpture was based on the Kine photograph, there were creative differences between the photograph and Mr. Liquori's sculpture.  Mr. Liguori obtained a registered copyright on the "Original bronze sculpture" in July 1998.  *Exhibit 29.*[2]

On or about November 21, 1999, Mr. Hansen and Mr. Liguori entered into an agreement pursuant to which Mr. Hansen commissioned Mr. Liguori to create a "two times life size" bronze statue of the High Scaler sculpture and to erect it at Hoover Dam, near Mr. Hansen's store.  Mr. Liguori, together with a team employed by him, constructed the statue, obtained and configured a large boulder on which it was to be mounted, and created a bronze plaque for the monument.  The statue and its boulder base were thereafter erected at Hoover Dam as provided for in the agreement.  Mr. Liguori obtained a registered copyright for the "High Scaler" statue in November 2000.  *Exhibit 30.*  Mr. Liguori also created a pencil or charcoal drawing of the "High Scaler," again based on the Kine photograph, which he also copyrighted in November 2000.  *Exhibit 45.*  Mr. Hansen commissioned Mr. Liguori to create other smaller sized sculptures of different dam workers.  Mr. Liguori created some of these sculptures and also obtained copyrights on them.  Mr. Hansen alleged in his counterclaim that Mr. Liquori did not produce all of the sculptures he was paid to create, and in one case was inadvertently paid twice for the same sculpture.

---

[2]Unless otherwise stated, references to exhibits are to trial exhibits.

On or about June 12, 2000, Mr. Liguori's company, Bruno Liguori Turquoise Trading Post, Inc., as Licensor, and Bert Hansen, "d/b/a Hoover Dam Snacketeria," and Kawana Pohe, "d/b/a Hoover Dam Store," as Licensees, entered into a written Retail Licensing Agreement. *Plaintiffs' Supplemental Brief (#246), Exhibit 1.* The Retail Licensing Agreement was a two page document and was signed on the second page by Mr. Hansen, Mr. Pohe, and Steven Liguori as president of Bruno Liguori Turquoise Trading Post, Inc. Attached to this two page agreement was an additional ten pages of written "Terms and Conditions," the last page of which was initialed by Mr. Liguori, Mr. Pohe and Mr. Hansen.

The Retail Licensing Agreement, beginning at the second paragraph on page one, states in pertinent part as follows:

ARTWORK:  THE HIGH SCALER, AND HOOVER DAM SERIES and any and all right to title, possession, property interest, copyright reproduction, licensing, intellectual property rights, etc., of every kind, nature and description, whether known or unknown, seen or unseen, real, tangible or intangible, including without limitation names, symbols, emblems, designs, service marks, trademarks, copyrights in graphic designs, logos, visual representations, and likenesses of ARTWORK.

LICENSED AREA:  HOOVER DAM, Nevada

Commencement Date:        12th June 2000
Expiration Date:                 Never

LICENSED PRODUCTS:  Models, facsimiles, miniatures, maquettes, photographic slides, photographs, cartoons, caricature, post cards, sculptures, T-shirts, hats, silhouettes, or any other popular and widely accepted tourist-related souvenirs.

GRANT OF RIGHTS: Exclusive, Except Bronze Statute

ROYALTIES:

Royalty Rate:              17%

Non-Returnable
Advance Against
Royalties:
. . .

This Agreement includes the terms and conditions on the pages attached hereto and made a part hereof.

*Supplemental Brief (#246), Exhibit 1, pg. 1.*

Paragraph 1 of the Terms and Conditions attached to the Retail Licensing Agreement states:

> Licensor hereby grants Licensee and Licensee hereby accepts the executive right to utilize the Licensed Property in connection with the manufacture, advertisement, distribution, and sale of Licensed Products in the Licensed Area during the Licensed Term.  All other rights with respect to the Licensed Property are hereby expressly reserved by Licensor.

*Id.*, *pg. 3*

Paragraph 3(a) of the Terms and Conditions further provides:

> At its sole cost and expense prior to the manufacture, distribution, or sale of the License Products hereunder, Licensee shall submit a prototype sample of each of the Licensed Products to Licensor, together with any packaging, container, carton, enclosed material, tag, label, wrapping, advertising, or promotional material for use in any media (hereinafter "Packaging") which will be associated in any manner with or used to promote the Licensed Products.  Licensee shall not commence any manufacture, distribution, or sale of Licensed Products unless and until Licensor provides written approval of the artwork, design quality and style of the Licensed Products and Packaging.  Licensor shall endeavor to provide Licensee with written approval or disapproval of the Licensed Products and Packaging as promptly as is reasonably possible.

*Id.*, *pg 4.*

Paragraph 5 of the Terms and Conditions further provides:

> As used in this Agreement, the term "Licensed Property" means each of the elements specified on page 1 hereof individually and all such elements associated therewith, the licensed property having a secondary meaning in the mind of the public.  Licensee acknowledges that the Licensed Property (including all rights therein and goodwill associated therewith) shall, as between Licensee and Licensor, be and remain Licensor's exclusive and complete property.  Licensor reserves the right to lease, authorize, or permit use of the Licensed Property by third parties, as it may see fit.
>
> Licensee will not use or authorize use of the Licensed Property in any manner, at any time, or in any place not specifically licensed herewith.

Mr. Hansen testified that Mr. Liquori presented this agreement to him and asked him to sign it.  He stated that he signed the agreement without reading it.  *Partial Transcript of Proceedings (#222), pgs. 36:19-38:12.*  Mr. Hansen also indicated that he did not discuss the terms of the agreement with Mr. Liguori at the time it was executed.  *Id., pg. 38:10-12.*  Mr. Liquori testified that the terms of the agreement were negotiated by the parties; that he had his lawyers review the agreement, and that he believed Mr. Hansen had his attorneys review the agreement before it was

signed. *Partial Transcript of Proceedings (#221), pg. 78:15-23.* He also testified that he and Mr. Hansen reviewed the terms of the agreement together. *Partial Transcript of Proceedings (#226), pg. 25:15-23.*

Defendant Hansen contracted with third parties to manufacture various items bearing the High Scaler image which were then sold in his store. Such items included plastic mugs *Exhibit 201*, goblets *Exhibit 207,* photographs and postcards *Exhibits 211, 213, 214, 215, 216,* patches *Exhibit 217*, t-shirts *Exhibit 218*, coffee mugs *Exhibit 219*, key chains *Exhibits 220, 227*, dinner plates *Exhibit 221*, cigarette lighters *Exhibits 225, 226*, small sculptures *Exhibit 230, 235*, flasks *Exhibit 246*, and teddy bears *Exhibit 252.* Defendant Hansen also sold a book entitled *The Story of Hoover Dam*, by Stanley Paher, on which the High Scaler image was printed on the back cover. (Other copies of the book were sold that did not contain the High Scaler image). With the exception of the book, Defendant Hansen did not dispute that the foregoing items were within the definition of "Licensed Products" in the Retail Licensing Agreement and that Plaintiffs were entitled to royalties on the sale of these items. Plaintiffs contended that Defendant Hansen failed to pay complete royalties on the sale of such items. Defendant Hansen contended that he paid all royalties due Plaintiffs on the sale of items within the scope of the Retail Licensing Agreement.

Defendant Hansen also used the High Scaler drawing image in the operation of his business. Mr. Hansen testified that near the time he entered into the Retail Licensing Agreement with Mr. Liguori in June 2000, he discussed with friends renaming his store the "High Scaler Café." *Partial Transcript of Proceedings (#222), pg. 38:13-22.* He further stated that when he decided to rename the store the High Scaler Café, he "needed some kind of logo for it to identify the restaurant." *Partial Transcript of Proceedings (#222), pg. 39:3-4.* Mr. Hansen told Mr. Liquori that he was going to try to get an artist "to do that image" so that he could use it as a store logo. According to Mr. Hansen, Mr. Liguori told him that he would be happy to create the logo. Mr. Liguori drew the High Scaler image drawing and handed it to him. Mr. Hansen further testified:

> Q. Okay. When he designed it, what type of discussion occurred and how did it get delivered to you?
>
> A. Well, he just handed – he just handed me the artwork and he may have even given me a – I can't recall. But most likely he could have

1    even given me one of those old little disk – diskette drives with it on.
2    I'm not sure.
     . . .

3    Q.  And what did he tell you you could do with this diskette?

4    A.  Well, we didn't really discuss anything.  I asked him to do artwork
     for a restaurant logo, and he did that.  And I didn't dwell on souvenirs
5    until later, because we were a long way from opening.

6    *Partial Transcript of Proceedings (#222), pg. 39:13-25*.

7    Defendant Hansen placed the High Scaler image on the front glass door of the High Scaler

8    Café.  *Exhibits 82, 85.*  The image was also placed on Defendant Hansen's business cards *Exhibit*

9    *208,* on printed cash register receipts *Exhibit 229, 231,* on menus *Exhibit 222,* on plastic shopping

10   bags *Exhibit 234,* and on employee hats and uniform shirts *Exhibits 250, 253.*  The image was also

11   placed on paper labels that were affixed to the plastic containers that held food items such as

12   sandwiches and salads sold in the High Scaler Café and on plastic bottles of water sold in the store.

13   *Exhibits 202-204, 224, 242.*  It was not clear from the trial testimony whether these labels were

14   affixed to the large variety of other food products sold in the store.  *See Exhibit 78 E, Food*

15   *Inventory.*  Mr. Hansen testified that he did not realize until after the lawsuit was filed that Mr.

16   Liguori had copyrighted the High Scaler drawing.  *Partial Transcript of Proceedings (#222), pg.*

17   *40:1-21.*  However, some of the souvenir items sold by Defendant, as well as the labels bearing the

18   High Scaler image, included Mr. Liguori's copyright legend.  *See e.g. Exhibits 202, 225, 226.*  Mr.

19   Hansen also testified that "[n]ot once from the time we opened until the present time has he ever sent

20   me a cease and desist letter on the use of the logo to badge the restaurant."  *Id., pgs. 42:25-43:4.*

21   Mr. Hansen testified that if a souvenir item had the High Scaler image on it, he considered it

22   subject to the the Retail Licensing Agreement.  *Partial Transcript of Proceedings (#245), pg. 19:15-*

23   *17.*  He testified that he did not believe that food items were brought within the scope of the

24   agreement if they displayed the High Scaler drawing on the packaging label.  *Id., pgs. 21:11-14;*

25   *29:17-24.*  Mr. Hansen further testified:

26   Q.  Okay. Now let's talk about water bottles.  If the water bottle was
     marketed and sold with the image on it, it would come within the
27   purview of the agreement; wouldn't it?

28   . . .

7

1    A.  Because its not a souvenir, I did not believe that it would.

2    *Partial Transcript of Proceedings (#223), pg. 86:9-12.*

3    Mr. Hansen also testified as follows:

4    Q.  Do you remember testifying in your deposition and telling us that if
     an article contained the image or used the image of the High Scaler on
5    it, that it was – it came within the purview of the retail licensing
     agreement?

6    A.  Any souvenir that contained that image.

7    *Id, pg. 83:10-14.*

8
9    Mr. Liguori testified that it was his belief that under the provisions of the Retail Licensing

10   Agreement, Defendant Hansen was allowed to use the High Scaler image so long as he paid Mr.

11   Liguori royalties for such use.  He testified as follows:

12   Q.  Was it your understanding, under the agreement, that they were
     allowed to use your drawing, your logo, under the retail licensing
13   agreement?

14   A.  Yes.

15   Q.  Could they use it for selling or advertising items that were not
     souvenirs?

16   A.  Yes.

17   Q.  Okay.  You are okay with that?

18   A.  As long as I get paid for it yes.

19   Q.  Was it your understanding that they were paying you for the food
     items – the royalties for the food items they were selling?

20   A.  That was the understanding.  They were going to pay me for
21   everything –

22   Q.  Okay.

23   A.  – that had anything to do with it.

24   *Partial Transcript of Proceedings (#221), pg. 19:10-25.*

25   The Terms and Conditions of the Retail Licensing Agreement provided that the "Licensor

26   and its duly authorized representative shall have the right at all reasonable hours of the day to

27   examine said books of account, records and all other documents and materials with respect to the

28   subject matter of this Agreement which are in Licensee's possession or under its control."

*Supplemental Brief (#246), Exhibit 1, pg. 3.* Mr. Liguori testified that in September 2009, he and his certified public accountant attempted to inspect the records, but were not permitted to do so. *Partial Transcript of Proceedings (#221), pg. 40:3-41:22.* There was no testimony, however, that prior to filing suit, Mr. Liguori informed Mr. Hansen that his use of the High Scaler image to brand his store, and its use on food containers, water bottles, menus, receipts, business cards, and other non-souvenir items was within the scope of the Retail Licensing Agreement.

Plaintiffs presented testimony by an accountant expert witness, Annette Carro, regarding the royalty payments that Defendant Hansen allegedly owed Plaintiffs. *Partial Transcript of Proceedings (#207), pgs. 1-64.* Ms. Carro testified that based on her review of business records provided to her, it was her opinion that Steven Liguori was owed $255,313.31 "in royalty payments for his licensed items." *Id., pg. 18:7-13.* Of that amount, it was her opinion that $130,203.50 was specific to "High Scaler items" based on sales records from April 2005 through September of 2012. *Id., pg. 18:14-19.* The remaining $125,019.81 represented the sale of "Hoover Dam" or "HD" items that might not have involved the use of Mr. Liguori's artwork. *Id., pg. 43:9-12.* Ms. Carro further testified that the gross sales of Defendant Hansen's business from April 2005 through September 2012 was $21,540,038.01. The "net revenue" for that period (gross sales minus sales tax) was $19,968,012.11. Ms. Carro further broke these figures down year by year from 2005 through 2012. *Id., pgs. 18:20-22:2.*

In forming her opinion, Ms. Carro made estimates from the limited business records provided to her of the total sales of "copyrighted items" by Defendant during the period from 2005 to September 2012. She testified:

> A. The first thing we did is we looked at the inventory listings that we received . . . . And we identified certain items in the inventory listing, that either had a "HD" or an "HS" or said "Hoover Dam."
>
> And then we took the cost of those items. We added up the cost of those items, and we divided it by the total cost of that inventory for that quarter, and we got a percentage. And then we took that percentage and multiplied it by the sales for the same time period. And that's how we arrived at the total sales that would be applicable, and then we took that by the 17 percent.

*Partial Transcript of Proceedings (#207), pgs. 24:21-25:19.*

9

Applying the 17% royalty rate to the estimated sales of copyrighted items resulted in her calculation of $255,313.31 in royalty payments that should have been made to the Plaintiffs during the period from 2005 through 2012.  Ms. Carro did not make any deduction for the royalties that were actually paid to Plaintiff and she acknowledged that Defendant would be entitled to an offset for those payments.  *Id., pgs. 22:3-5.*

Ms. Carro estimated that the total sales of water bottles for the period 2005 through 2012 was $298,075.48.  Assuming that the labels on the water bottles sold during this period all bore the High Scaler image and were within the scope of the Retail Licensing Agreement, a 17% royalty on these sales would have been approximately $51,000.  *Id., pg. 46:24-49:4.*  Ms. Carro further testified that if the royalties were limited to High Scaler items and did not include the sales of bottled water, the total royalties due Mr. Liguori were approximately $80,000.  *Id., pg. 49:6-16.*

During final argument, Plaintiffs' counsel argued that all of Defendant's net revenue from sales during the period from April 1, 2005 (the beginning of the statute of limitations period) through December 1, 2012 should be subject to the Retail Licensing Agreement and the payment of a 17% royalty thereon.  This would result in damages for breach of contract in the amount of $3,492,922.63.  *Partial Transcript of Proceedings (#209), pgs. 21:16-22:16.*  Plaintiffs' counsel based this argument on a broad reading of the Retail Licensing Agreement and on Mr. Hansen's deposition testimony that "the image is the image" and that whenever the image was used, it came under the purview of the agreement.  *Id., pgs. 6:4-9:9.*  In the alternative, Plaintiffs' counsel argued that if the jury believed "the use of the High Scaler image to advertise the store did not come under the purview of the contract," then it should award Plaintiffs $130,203.50 in unpaid royalties plus an additional $9,154.50 in royalties on the sale of the book *The Story of Hoover Dam.  Id., pgs. 22:17-24:1.*  Plaintiffs' counsel also argued under this alternative theory that Defendant Hansen's use of the High Scaler image to brand his store and non-souvenir products infringed Plaintiff's copyright in that image.  *Id., pg. 24:7-13.*  He argued that Defendant's copyright infringement was willful and that Plaintiffs were entitled to the maximum statutory damages for copyright infringement-$150,000.00.  *Id.*

. . .

The jury's award of $1,200,000.00 in damages for breach of the Retail Licensing Agreement was $2,292,922.63 less than the amount Plaintiffs' counsel argued should be awarded if all of Defendant's net revenue between 2005 and 2012 was found to be within the scope of the licensing agreement.  The damages award, however, was $1,060,642.00 greater than the $139,358.00 that Plaintiffs' counsel requested under his alternative damages theory which was based on Ms. Carro's royalty calculations, plus the royalties for *The Story of Hoover Dam* book.  The damages award was also substantially greater than the $255,313.31 that Ms. Carro estimated was the total amount of royalties due Plaintiffs if "Hoover Dam" or "HD" inventory items were included in the calculation. The jury also awarded the maximum statutory damages for copyright infringement which Plaintiffs' counsel asked for only if the jury found that Defendant's use of the High Scaler image to sell food, water or other non-souvenir items was outside the scope of the Retail Licensing Agreement.

## DISCUSSION

**1.    Defendant's Motion for Judgment as a Matter of Law.**

Rule 50(a) of the Federal Rules of Civil Procedure provides that if a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may resolve the issue against the party and grant a motion for judgment as a matter of law against the party on a claim or defense that, under controlling law, can be maintained or defeated only with a favorable finding on that issue.  A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury.  In this case, the Court denied Defendant's motions for judgment as a matter of law before the case was submitted to the jury.

Rule 50(b) provides:

> If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal question raised by the motion.  No later than 28 days after the entry of judgment— or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged— the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59.  In ruling on the renewed motion, the court may:

. . .

1        (1)    allow judgment on the verdict, if the jury returned a verdict;

2        (2)    order a new trial; or

3        (3)    direct the entry of judgment as a matter of law.

In ruling on a motion for judgment as a matter of law, "[a] jury's verdict must be upheld if it is supported by substantial evidence." *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007), citing *Johnson v. Paradise Valley Unified School District*, 251 F.3d 1222, 1227 (9th Cir. 2001). *Wallace* further states:

> "Substantial evidence is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion from the same evidence." *Id.* In making this determination, the court must not weigh the evidence, but should simply ask whether the plaintiff has presented sufficient evidence to support the jury's conclusion. *See id.* at 1227-28. While the court must review the entire evidentiary record, it must disregard all evidence favorable to the moving party that the jury is not required to believe. *Id.* at 1227. The evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party. *Id.* Judgment as a matter of law may be granted only where, so viewed, the evidence permits only one reasonable conclusion and that conclusion is contrary to the jury's verdict. *McLean v. Runyon*, 222 F.3d 1150, 1153 (9th Cir. 2000).

479 F.3d at 624.

As discussed in the following section, the Court concludes that a new trial is required in this case because the jury could not reasonably have awarded Plaintiffs damages for breach of contract in the amount of $1,200,000.00 and, given the amount of that verdict, could not have also found Defendant liable for copyright infringement. Based on the evidence presented at trial and viewing it in the light most favorable to the Plaintiffs, however, the jury could have found that Defendant failed to pay royalties on the sales of all souvenirs that were subject to the Retail Licensing Agreement and could have also found that Defendant infringed Plaintiffs' copyright.

Plaintiffs presented evidence that Defendant did not provide an adequate accounting for the sales of souvenirs and refused to permit Mr. Liguori and his accountant to inspect the sales records as he was entitled to do under the agreement. Plaintiffs' expert witness, Annette Carro, testified regarding her opinion of the royalties that should have been paid to Plaintiffs. Ms. Carro based her opinion on the limited inventory and sales records that were made available to her. From those

records, she estimated the percentage of souvenir inventory to the total sales inventory.  She applied

that percentage to Defendant's total gross sales or net revenues to estimate the total sales of souvenir

items during the period from 2005 to 2012.  Ms. Carro then applied the 17% royalty rate to the

estimated souvenir sales revenue.  Although Ms. Carro's opinion was debatable, the jury could have

found the amount of royalties that should have been paid was greater than the amount Defendant

actually paid.  Evidence was also presented that Defendant sold copies of *The Story of Hoover Dam*

that had the High Scaler image printed on the book's cover.  The jury could have reasonably

concluded that these books were souvenirs within the scope of the Retail Licensing Agreement for

which royalties should have been paid, but were not paid.  Defendant is therefore not entitled to

judgment as a matter of law on the breach of contract claim.

Defendant argues that he is entitled to judgment as a matter of law on Plaintiffs' copyright

infringement claim because Mr. Liguouri provided the High Scaler drawing to Mr. Hansen to use as

a logo for the High Scaler Café; there was no agreement that Mr. Hansen would pay Mr. Liguouri for

the right to use the drawing as a logo; and that prior to filing suit, Mr. Liguori never objected to Mr.

Hansen's use of the drawing or requested payment for its use.  The jury could have reasonably found,

however, that Mr. Liguori provided the High Scaler drawing to Defendant to use in the design and

production of souvenirs pursuant to the Retail Licensing Agreement; that he did not give Mr. Hansen

permission to use the drawing as a logo or to advertise the High Scaler Café; and his alleged failure

to object did not estop him from seeking recovery for copyright infringement.  Defendant is therefore

not entitled to judgment as a matter of law on the copyright infringement claim.

## 2.    Defendant's Motion for New Trial.

Rule 59(a)(1)(A) of the Federal Rules of Civil Procedure provides that after a jury trial, the

court may, on motion, grant a new trial on all or some of the issues, and to any party, "for any reason

for which a new trial has heretofore been granted in an action at law in federal court." *Molski v. M.J.*

*Cable Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) states:

> "Rule 59 does not specify the grounds on which a motion for new trial
> may be granted." *Zang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020,
> 1035 (9th Cir. 2003).  Rather, the court is "bound by those grounds
> that have been historically recognized." *Id.*  Historically recognized
> grounds include, but are not limited to, claims "that the verdict is

against the weight of the evidence, that the damages are excessive, or that for other reasons, the trial was not fair to the party moving." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251, 61 S.Ct. 189, 85 L.Ed. 147 (1940).  We have held that "[t]he trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based on false or perjurious evidence, or to prevent a miscarriage of justice." *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 510 n. 15 (9th Cir. 2000).

In considering a motion for new trial, the court has "'the duty . . . to weigh the evidence as [the court] saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in [the court's] conscientious opinion, the verdict is contrary to the clear weight of the evidence.'"  *Molski*, 481 F.3d at 729, quoting *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990) (quoting *Moist Cold Refrigerator Co. v. Lou Johnson Co.*, 249 F.2d 246, 256 (9th Cir. 1957).  The court may not grant a new trial, however, simply because it would have arrived at a different verdict.  *Wallace v. City of San Diego*, 479 F.3d at 630, citing *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 818 (9th Cir. 2001).  "The court should 'abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result.'"  *Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d Cir. 1978), quoting 6A *Moore's Federal Practice* ¶ 59.08[5], at 59-160-59-161 (1973).  *See also A.H.D.C. v. City of Fresno, Cal.*, 2004 WL 5866233, *9 (E.D.Cal. 2004).

In *Landes Const. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987), the court stated that in considering a motion for new trial, the judge can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party.  The court further stated:

But after weighing the evidence, the trial judge faces a difficult task:

It may be doubted whether there is any verbal formula that will be of much use to trial courts in passing on motions [for a new trial on the grounds that the verdict is against the clear weight of the evidence]. Necessarily all such formulations are couched in broad and general terms that furnish no unerring litmus for a particular case. On the one hand, the trial judge does not sit to approve miscarriages of justice. His power to set aside the verdict is supported by clear precedent at common law and, far from being a denigration or a usurpation of jury trial, has long been regarded as an integral part of trial by jury as we know it. On the other hand, a decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system,

14

certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter. Probably all that the judge can do is to balance these conflicting principles in the light of the facts of the particular case. If, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial.

11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2806, at 48–49 (1973) (footnotes omitted); *see Farley Transp. Co. v. Santa Fe Trail Transp. Co.,* 786 F.2d 1342, 1347 (9th Cir. 1985); *City of Phoenix v. Com/Systems, Inc.,* 706 F.2d 1033, 1036 (9th Cir. 1983); *Angle v. Sky Chef, Inc.,* 535 F.2d 492, 494 (9th Cir. 1976).

*Landes,* 833 F.2d at 1371-72.

In this case, the award of $1,200,000.00 in damages for breach of the Retail Licensing Agreement may be upheld if the jury could reasonably find that Defendant's sale of food items and bottled water was within the scope of the agreement. Under Nevada law, the interpretation of an unambiguous contract is a question of law to be decided by the court. *Galardi v. Naples Polaris, LLC,* 129 Nev.Adv.Op. 33, 301 P.3d 264, 366 (2013), citing *Ellison v. Cal. State Auto. Ass'n,* 106 Nev. 601,603, 797 P.2d 975, 977 (1990). Whether a contract is ambiguous is also a question of law for the court. *Id.,* citing *Margrave v. Dermody Props.,* 110 Nev. 824, 827, 878 P.2d 291, 293 (1994). A contract is ambiguous if its terms may reasonably be interpreted in more than one way. *Id.,* citing *Anvui, LLC v. G.L. Dragon, LLC,* 123 Nev. 212, 215, 163 P.3d 405, 407 (2007). Ambiguity does not arise, however, simply because the parties disagree on how the contract should be interpreted. The court may reject an unreasonable interpretation offered by one party and therefore conclude that the contract is unambiguous. *Id.,* citing *Parman v. Petricciani,* 70 Nev. 427, 430-32, 272 P.2d 492, 493-94 (1954), *abrogated on other grounds by Wood v. Safeway, Inc.,* 121 Nev. 724, 121 P.3d 1026 (2005). The Nevada Supreme Court has also stated that "[c]ontract interpretation strives to discern and give effect to the parties' intended meaning" and that words used in the contract "derive meaning from usage and context." *Galardi,* 301 P.3d at 367. An interpretation which makes the contract or agreement fair and reasonable will be preferred to one which leads to a harsh and unreasonable result. *Mohr Park Manor v. Mohr,* 83 Nev. 107, 111, 424 P.2d 101, 104 (1967). *See also Gol TV, Inc. v. Echostar Satellite Corp.,* 692 F.3d 1052,1055 (10th Cir. 2012) (applying Colorado law).

The Retail Licensing Agreement is by no means a model of clarity.  In ruling on the parties' pretrial motions for summary judgment, Judge Dorsey[3] found that the meaning of "ARTWORK, THE HIGH SCALER, AND HOOVER DAM SERIES," as stated in the second paragraph of the agreement, is ambiguous.  *Reporter's Transcript of Proceedings (#117), pg. 8:4-13; 37:3-38-1.* There is no ambiguity, however, that the agreement licensed Defendant Hansen to manufacture and sell souvenirs that incorporated Plaintiff Liguouri's artwork, including the High Scaler sculpture and the High Scaler image.  In this regard, the agreement defined "Licensed Products" as "[m]odels, facsimiles, miniatures, maquettes,[4] photographic slides, photographs, cartoons, caricature, post cards, sculptures, T-shirts, hats, silhouettes, or any other popular and widely accepted tourist-related souvenirs."

The word "souvenir" is generally defined as "something that serves as a reminder." *Merriam-Webster's Collegiate Dictionary,* (11th ed. 2004).  *Russ Berrie & Co. v. United States*, 76 Cust.Ct. 218, 417 F.Supp. 1035, 1041 (1976) lists the following dictionary definitions of souvenir and its synonym keepsake: *Webster's New World Dictionary of American Language* (College ed., 1962): "souvenir n. something kept or serving as a reminder of a place, an occasion or a person; keepsake; momento; keepsake n. something kept, or to be kept, for the sake of, or in memory of the giver; momento;" *Webster's New International Dictionary* (2d ed., 1948):  "souvenir n. . . .  That which serves as a reminder; a remembrancer; momento; keepsake;  A memory; recollection; keepsake n. . . . .  Anything kept or given to be kept, for the sake of the giver; a token of friendship."

From the viewpoint of a souvenir collector, various items can be "souvenirs" regardless of whether they have been sold as such.  Individuals may, for example, consider paper napkins, matchbooks, or stationary to be souvenirs of the restaurants, bars or hotels they have visited.  It is possible that a souvenir collector might consider a plastic food container or water bottle with a particular business's label on it to be a souvenir or keepsake.  In the context of the Retail Licensing

---

[3]On January 13, 2015, the parties consented to trial before a magistrate judge and this case was randomly reassigned to the undersigned magistrate judge. *Order (#135).*

[4]"Maquette" is defined as a "small preliminary model or something designed esp. to gauge the general appearance or composition of the thing that is planned." *Webster's Third New International Dictionary* (2002).

Agreement, however, it was clearly the intent of the parties that Mr. Hansen (and the other licensee

Mr. Pohe) would manufacture and sell marketable souvenirs bearing Plaintiff's artwork and would

pay Plaintiff a 17% royalty on the sale of such items.  Examples of such items were listed in the

definition of "Licensed Products" and were, in fact, manufactured and sold by Defendant Hansen.

Defendant Hansen also sold food and water in plastic bottles.  These items were obviously

sold for human consumption and cannot reasonably be characterized as souvenirs within the

common meaning of that word.  The fact that Mr. Hansen used the High Scaler image to advertise

his café or to market his food and water products, including using the image on the labels of those

products, cannot reasonably be interpreted to bring the sales of such items within the scope of the

Retail Licensing Agreement.  Mr. Liguori's testimony that he believed such sales were within the

scope of the agreement is purely self-serving and not credible.  There was no evidence that Mr.

Liguori ever informed Mr. Hansen of this interpretation of the agreement prior to the filing of the

lawsuit.  Moreover, there is no reasonable basis to believe that if Mr. Hansen had been informed of

this interpretation, he would have agreed to pay Plaintiffs 17% of the gross revenue from the sale of

food and water products for the privilege of using the High Scaler image, and from the remainder left

to him, would pay his costs of supply, employee wages and benefits, other overhead costs, and the

federal government's share of the business's profits.[5]

_____

[5]The allegations in Plaintiffs' original complaint are consistent with the interpretation that the Licensing Agreement was limited to the manufacture and sale of souvenirs and did not apply to the use of Plaintiff's copyrighted images beyond that purpose.  The original complaint alleged that:

> The largest part of LIGUORI'S compensation for creating [the large scale High Scaler statue] was an agreement under which [Plaintiffs] licensed to defendants the right to manufacture and sell souvenirs based on LIGUORI'S work in exchange for a 17% royalty on all licensed products. . . . Defendants have exploited Liguori's work to their great commercial advantage.  Defendants have manufactured and sold, and continue to sell, a significant volume of souvenirs that utilize [Plaintiffs'] works.  *Defendants have even used LIGUORI'S works in a number of ways that go far beyond licensed purposes.  For instance, Defendants operate a restaurant known as the "High Scaler Café" which utilizes LIGUORI'S work in its marketing materials, menu, signage, and other items.*  (Emphasis added.)

*Complaint (#1), pgs. 1-2.*

By its verdict of $1,200,000.00, the jury apparently concluded that the award of 17% of all of Defendant's gross sales or net revenue (gross sales minus sales tax) for the period between 2005 and 2012 (nearly $3.5 million) was not reasonable.  The verdict, however, still far exceeded any amount that Plaintiffs were reasonably entitled to recover as damages for Defendant's failure to pay royalties on the sale of souvenirs.

The law regarding the intersection between breach of contract and copyright infringement also demonstrates why the jury's verdicts cannot stand.  "'A copyright owner who grants a nonexclusive limited license ordinarily waives the right to sue licensees for copyright infringement, and it may only sue for breach of contract.'"  *MDY Industries, LLC v. Blizzard Entertainment*, 629 F.3d 928, 939 (9th Cir. 2010), quoting *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1121 (9th Cir. 1999).  "However, if the licensee acts outside the scope of the license, the licensor may sue for copyright infringement."  *Id.* (internal citation omitted).  "To recover for copyright infringement based on breach of a license agreement, (1) the copying must exceed the scope of defendant's license and (2) the copyright owner's complaint must be grounded in the exclusive right of copyright (e.g., unlawful reproduction or distribution)."  *MDY Industries*, 629 F.3d at 940, citing *Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307, 1315-16 (Fed.Cir. 2005).  "Consistent with this approach, we have held that the potential for infringement exists only where the licensee's action (1) exceeds the license's scope (2) in a manner that implicates one of the licensor's exclusive statutory rights."  *Id.*  The jury in this case was instructed in accordance with this law.  *See Jury Instructions (#179), pgs. 24 and 30, Instruction Nos. 24 and 28.*

The verdict for copyright infringement clearly shows that the jury found that Mr. Hansen did not have Plaintiffs' permission to use the High Scaler image to brand his restaurant or advertise the sale of food and water products.  The jury's award of $1,200,000.00 for breach of contract, however, cannot be reconciled with the verdict for copyright infringement.  The breach of contract verdict far exceeded any amount that could have been awarded for Defendant's alleged failure to pay royalties on souvenirs and is only consistent with a finding that Defendant's sale of food, water or other non-souvenir items bearing the High Scaler image were within the scope of the Retail Licensing Agreement.  In that case, there was no factual basis for the jury to also return a verdict for copyright

18

infringement.

The law regarding proof of damages for copyright infringement further demonstrates the unreasonableness and unfairness of the verdicts in this case.  A copyright infringer may be held liable for the copyright owner's actual damages and any additional profits of the infringer.  The copyright owner may elect, instead, to recover statutory damages.  17 U.S.C. § 504(a)-(c).  If Plaintiffs had elected to seek actual damages and the infringer's profits, they would have been required to present evidence in support of their alleged damages.  The Ninth Circuit has noted that "'[o]n its face, § 504(b) does not differentiate between 'direct profits' – those that are generated by selling an infringing product – and 'indirect profits'– revenue that has a more attenuated nexus to the infringement.'"  *Polar Bear Productions, Inc. v. Timex Corp.*, 384 F.3d 700, 710 (9th Cir. 2004), quoting *Mackie v. Rieser*, 296 F.3d 909, 914 (9th Cir. 2002).  A copyright infringement plaintiff who seeks to recover indirect profit damages, "'must proffer some evidence . . . [that] the infringement at least partially caused the profits that the infringer generated as a result of the infringement.'  *Mackie*, 296 F.3d at 911 (discussing the standard for summary judgment)."  The court further stated:

> From this principle, it is implicit that the profits sought are those that arise from the infringement.  Thus, a copyright owner is required to do more initially than toss up an undifferentiated gross revenue number; the revenue stream must bear a legally significant relationship to the infringement.  The result is that a plaintiff seeking to recover indirect profits must "formulate the initial evidence of gross revenue duly apportioned to relate to the infringement."  4 NIMMER ON COPYRIGHT § 14.03[B], 14-39.

*Polar Bear*, 384 F.3d at 711.

Plaintiffs did not present any evidence regarding the reasonable market value of a business logo such as the High Scaler image.  Nor did they introduce any evidence of the extent to which Defendant's sales of food, water or other non-souvenir items were enhanced by the use of the High Scaler image.  The difficulty of proving the profits attributable to Defendant's use of the High Scaler image probably explains Plaintiffs' election of a statutory damages remedy.

Plaintiffs have proposed, as alternative to the granting of a new trial, that they will accept the judgment based on the $1,200,000.00 breach of contract verdict and waive the judgment based on the copyright infringement verdict.  As stated above, however, the breach of contract verdict is

contrary to the terms of the Retail Licensing Agreement and cannot stand regardless of whether recovery for copyright infringement is waived.  Plaintiffs' proposal must therefore be rejected.  The Court concludes that the jury's verdicts in this case are against the clear weight of the evidence, are contrary to law, and, if allowed to stand, would result in a miscarriage of justice.  Defendant is therefore entitled to a new trial.

The Court also concludes that Defendant is entitled to a new trial on the issues of liability and damages as to both the breach of contract and copyright infringement claims.  The Supreme Court has stated that a partial new trial "may not be resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice."  *Gasoline Products Co., Inc. v. Champlin Refining Co.*, 283 U.S. 494, 500, 51 S.Ct. 513, 515 (1931).  The Tenth Circuit states that:

> Courts and commentators have interpreted *Gasoline Products* to require full retrials in two instances.  The first, and more common, is when an error or insupportable damages award calls into question the propriety of the *original* jury's finding of liability.  The most common example is a compromise verdict, i.e, an award of suspiciously low damages in a case of closely contested liability. . . . (citations omitted.)  The second rationale for requiring a retrial on all issues does not look back to the propriety of the original jury's finding on liability.  It instead looks forward to the new jury's inquiry.  That rationale bars a limited retrial when two issues are inextricably intertwined.  If a district court were to retry only one of two such intertwined issues to a second jury, while maintaining the vitality of the first jury's findings on the other issue, it would cause confusion and uncertainty and, thus, an unfair trial.

*Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.*, 175 F.3d 1221, 1255-56 (10th Cir. 1999).

The Third Circuit in *Pryer v. Slavic*, 252 F.3d 448, 455 (3rd Cir. 2001) states that it has steadfastly applied the *Gasoline Products* standard "'to prevent limited new trials where a tangled or complex fact situation would make it unfair to one party to determine damages apart from liability, or where there is reason to think that the verdict may represent a compromise among jurors with different views on whether defendant was liable.'"

In this case, the jury on retrial must decide whether Defendant Hansen breached the Retail License Agreement by not paying royalties on souvenir products within the scope of the Retail

20

Licensing Agreement.  The jury in the second trial should determine whether Defendant Hansen breached the agreement by not paying royalties on such items and, if so, the amount of royalties that are owed.  As stated above, the jury's verdicts for breach of contract and copyright infringement were clearly inconsistent and cast doubt on the jury's finding of liability for copyright infringement, as well as the amount of statutory damages that should be awarded for infringement.  On retrial, the jury should determine in light of the proper scope of the Retail Licensing Agreement, whether Defendant Hansen infringed Plaintiffs' copyright on the High Scaler drawing by using it to brand his restaurant and market his food and water products.

Defendant raised other factual issues in support of his motion for new trial including that Plaintiff improperly introduced testimony and made argument regarding the alleged $500,000 value of the High Scaler monument statue; made an improper and inflammatory argument regarding the meaning of the terms "HS Man" and "HS Word" as used in Defendant's records regarding royalty payments to the Plaintiffs; and on the ground of jury misconduct based on the failure of a juror to disclosure during *voir dire* that he was a party in a civil action.  The Court makes no finding that these grounds, either separately or collectively, justify a grant of new trial.  The Court notes that the error and prejudice resulting from Plaintiffs' counsel's argument that Plaintiffs were entitled to royalties on Defendant's entire gross sales or net revenue from 2005 to 2012 far outweighed any prejudice resulting from Plaintiffs' reference to the alleged value of the monument statue, or his arguments regarding "HS Man" and "HS Word."

### 3.    Defendant's Alternative Motion for Remittitur.

Defendant requests that as an alternative to granting a new trial, the Court should grant a remittitur.  Defendant's proposed remittitur, however, is that Plaintiffs receive nothing for breach for the licensing agreement and that the court bar any award for copyright infringement.  *Motion (#212), pg. 21.*  This would be the equivalent to granting judgment as a matter of law to the Defendant which, as stated above, is not warranted.   Plaintiffs argue that if the Court decides to grant remittitur on the breach of contract judgment, it should be in the amount of $83,192.47.  This figure is based on Ms. Carro's testimony that Defendant owed $130,203.50 in unpaid royalties for the sale of High Scaler items, including water.  If the sales of bottled water were deducted, the amount owed would

be $79,530.67.  Plaintiffs would add to this figure an additional sum of $3,661.80 for royalties on the sale of the book *The Story of Hoover Dam* which bore the High Scaler image on the cover.  The royalties that Defendant actually paid to Plaintiffs would be deducted from the $83,192.47.  Plaintiff states, on information and belief, that Defendant paid only $3,500.00 in royalties.  *See Plaintiffs' Supplemental Briefing on Contract and Copyright Claims, and Remittitur (#246), pgs. 8-9.* (Defendant would also be entitled to an offset of  $19,000.00 for the stipulated recovery on his counterclaim.)  Plaintiffs presumably request that the Court uphold the copyright infringement verdict in the amount of $150,000.00.

When a jury award is deemed to be excessive, the court may order a new trial under Rule 59 or, in its discretion, may condition denial of the motion for new trial on plaintiff accepting a remittitur of the excessive portion of the award.  *Datskow v. Teledyne Continental Motors*, 826 F.Supp. 677, 690-91 (W.D.N.Y. 1993).  "Although there are no firm rules governing which of these two courses should be taken, in general remittitur is employed when 'the award is 'intrinsically excessive' in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error.' *Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir. 1984) (quoting *Akermanis v. Sea-Land Service, Inc.*, 688 F.2d 898 (2d Cir. 1982), *cert. denied*, 461 U.S. 927, 103 S.Ct. 2087, 77 L.Ed.2d 298 (1983)).  Thus, remittitur is appropriate when 'a properly instructed jury hearing properly admitted evidence makes an excessive award'; however, when 'prejudicial error has infected the jury's entire consideration of plaintiff's pecuniary loss,' the court must grant a new trial." *Id.* 826 F.Supp. at 691.  *See also Machesney v. Larry Bruni, M.D., P.C.*, 905 F.Supp. 1122, 1131 (D.D.C. 1995); *Price v. Delaware Dept. of Correction*, 40 F.Supp.2d 544, 551 (D.Del. 1999).  If the court exercises its discretion to grant remittitur, it must be for the maximum amount sustainable by the proof so as to prevent the court's substitution of its judgment for that of the jury.  *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1085 (9th Cir. 2014), citing *D & S Redi-Mix v. Sierra Redi-Mix & Contracting Co.*, 692 F.2d 1245, 1249 (9th Cir. 1982).

The Court concludes that under the circumstances of this case a grant of remittitur is not appropriate.  The jury's award of damages for breach of contract was based on a clear error regarding

the scope of the Retail Licensing Agreement.  This error infected the jury's entire consideration of the royalties that Plaintiffs were entitled to recover.  The verdict returned by the jury was clearly based on the sales of food or water products not within the scope of the agreement.  Any remittitur granted by the court would be only its view of what a jury could reasonably award for breach of contract *under the agreement as properly interpreted.*

## CONCLUSION

Based on the foregoing, the Court concludes that Defendant is not entitled to judgment as a matter of law under Rule 50(b).   Defendant is, however, entitled to a new trial on all claims and issues pursuant to Rule 59(a)(1)(A).  A grant of remittitur is not appropriate under the circumstances of this case.  Accordingly,

**IT IS HEREBY ORDERED** that Defendant Bert Hansen's Motion for Judgment as a Matter of Law, for New Trial Pursuant to FRCP 59(a), or in the Alternative for Remittitur Pursuant to FRCP 59(a) (#212) is **granted**, in part, and **denied**, in part, as follows:

1.      Defendant's motion for judgment as a matter of law is **denied**.

2.      Defendant's motion for new trial is **granted** as to Plaintiffs' claims for breach of contract and copyright infringement.  The Court declines to grant remittitur as an alternative to a new trial.

DATED this 18th day of September, 2015.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge