1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| STEVEN LIGUORI, *et al.*,      ) | |
|      Plaintiffs,     ) | Case No. 2:11-cv-00492-GWF |
|           ) | **ORDER** |
| vs.           ) | |
| BERT HANSEN, *et al.*,      ) | **Re:    Motions for Attorneys' Fees and** |
|      Defendants.     ) |              **Nontaxable Costs.** |

This matter is before the Court on Plaintiffs' Motion for Attorney's Fees and Nontaxable Costs (ECF No. 393), filed on August 25, 2016. Defendant filed his Response (ECF No. 402) on September 12, 2016 and Plaintiffs filed their Reply (ECF No. 406) on September 22, 2016. Also before the Court is Defendant's Motion for Attorney's Fees and Nontaxable Costs (ECF No. 392) filed on August 25, 2016. Plaintiffs filed their Opposition (ECF No. 403) on September 12, 2016 and Defendant filed his Reply (ECF No. 404) on September 19, 2016. The parties agreed to waive oral argument on these motions.

## BACKGROUND

This case was tried twice to a jury. The first trial took place in May 2015 and resulted in jury verdicts in Plaintiffs' favor on their claims for breach of contract and copyright infringement. The Court, however, granted Defendant's motion for new trial and set aside the verdict and judgment. *Order (ECF No. 262)*. The second trial took place from June 13 to 17, 2016 and also resulted in a jury verdict and judgment in Plaintiffs' favor on their breach of contract and copyright infringement claims. Plaintiff's filed a Bill of Taxable Costs on August 25, 2016 in the total amount of $21,589.95. *Bill of Costs (ECF No. 395)*. Plaintiffs also seek an award of attorney's fees in the amount of $970,882.50 and

nontaxable costs in the amount of $66,164.89.  Defendant argues, however, that he is the prevailing party and should be awarded fees and costs in defending this action.  Defendant seeks $290,655.18 in attorney's fees and $16,265.18 in costs.

### 1.   Underlying Facts.

Defendant Bert Hansen has for many years operated a food store/snack shop at Hoover Dam, Nevada under the auspices of the Nevada Bureau of Services to the Blind and Visually Impaired.  Mr. Hansen pays a percentage of the store's net profits to the government and keeps the remainder.  Mr. Hansen's store was formerly known as the "Snacketeria" and was later renamed the "High Scaler Café." Over time, Mr. Hansen's store was located at various places on the Nevada side of Hoover Dam. Plaintiff Steven Liguori is an artist who, among other things, designs and creates jewelry and sculptures.

Mr. Hansen's and Mr. Liguori's business relationship began in the 1990's when Mr. Hansen provided Mr. Liguori with space in his store to sell jewelry items in exchange for one third of the proceeds from the sale of said items.  After Mr. Hansen's store was relocated to the Hoover Dam parking garage facility, and another location operated by him was closed, he no longer had space for Mr. Liguori's jewelry items.  Mr. Liguori obtained space to sell his jewelry in an adjacent store operated by Kawana Pohe.[1]  In the mid 1990's, Mr. Hansen and Mr. Liguori discussed ideas for a sculpture commemorating the workers who built Hoover Dam.  As a result of those discussions, Mr. Liguori created a two foot tall bronze sculpture called the "Hoover Dam High Scaler" or "High Scaler."  A high scaler was a worker who sat in a bosun's chair suspended by ropes along the canyon walls and prepared them for demolition.  Mr. Liguori's "High Scaler" sculpture was based on a photograph of Hoover Dam worker, Joe Kine.  Mr. Liguori obtained a registered copyright on the original bronze sculpture in July 1998.  Mr. Liguori created sculptures of other Hoover Dam workers on which he also obtained registered copyrights.

In November, 1999, Mr. Hansen and Mr. Liguori entered into a written agreement pursuant to

---

[1]Mr. Pohe was originally a defendant in this action, but was dismissed in June 2013 pursuant to a settlement with the Plaintiffs. *See Order (ECF No. 89).*

which Mr. Hansen commissioned Mr. Liguori to create a "two times life size" bronze statue of the High

Scaler sculpture and erect it at Hoover Dam near Mr. Hansen's store.  The written agreement provided

that Mr. Hansen would pay Mr. Liguori a total fee of $166,158.00, plus all change orders allowed

pursuant to the contract.  *See Plaintiffs' Trial Brief (ECF No. 140), Exhibit 5 ("Monument*

*Agreement").*  Mr. Liguori, together with a team employed by him, constructed the statue, configured a

large boulder on which the statue was mounted, and created a bronze plaque for the monument.  The

statue was thereafter erected at Hoover Dam.  Mr. Hansen paid the amounts specified in the Monument

Agreement, plus additional amounts pursuant to change order(s).  Mr. Liguori obtained a registered

copyright for the "High Scaler" statue or monument in November 2000.

On or about June 12, 2000, Bruno Liguori Turquoise Trading Post, Inc., as Licensor, and Bert

Hansen, "d/b/a Hoover Dam Snacketeria," and Kawana Pohe, "d/b/a Hoover Dam Store," as Licensees,

entered into a written Retail Licensing Agreement which stated as follows:

> ARTWORK:  THE HIGH SCALER, AND HOOVER DAM SERIES and
> any and all right to title, possession, property interest, copyright
> reproduction, licensing, intellectual property rights, etc., of every kind,
> nature and description, whether known or unknown, seen or unseen, real,
> tangible or intangible, including without limitation names, symbols,
> emblems, designs, service marks, trademarks, copyrights in graphic
> designs, logos, visual representations, and likenesses of ARTWORK.
>
> LICENSED AREA:  HOOVER DAM, Nevada
>
> Commencement Date:        12th June 2000
> Expiration Date:                Never
>
> LICENSED PRODUCTS:  Models, facsimiles, miniatures, maquettes,
> photographic slides, photographs, cartoons, caricature, post cards,
> sculptures, T-shirts, hats, silhouettes, or any other popular and widely
> accepted tourist-related souvenirs.
>
> GRANT OF RIGHTS: Exclusive, Except Bronze Statute
>
> ROYALTIES:
>
> Royalty Rate:            17%
>
> Non-Returnable
> Advance Against
> Royalties:
>
> This Agreement includes the terms and conditions on the pages attached
> hereto and made a part hereof.
>
> *See Supplemental Brief (ECF No. 246), Exhibit 1, Retail Licensing Agreement.*

3

Section 13(e) of the Terms and Conditions attached to the Retail Licensing Agreement stated that "[t]his Agreement and all matters or issues collateral thereto shall be governed by the laws of the State of Nevada applicable to contracts performed entirely therein."  Section 13(f) further stated that "[i]f any legal action or proceeding is brought for the enforcement of this Agreement or as a result of a breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorney's fees and other costs incurred in that action or proceeding in addition to any other relief to which such party may be entitled."

Mr. Hansen purchased various souvenir products from vendors which incorporated images of Plaintiff's copyrighted High Scaler sculpture, monument, and drawing.  These included plastic mugs, goblets, photographs, postcards, patches, t-shirts, coffee mugs, key chains, dinner plates, cigarette lighters, small sculptures, flasks, and teddy bears.  Mr. Hansen sold these souvenirs in his store and asserted that he paid Mr. Liguori all royalties that were due for such sales.  Mr. Liguori believed, however, that he was not paid all royalties due to him and he therefore sought to inspect Mr. Hansen's books and records pursuant to Section 2(e) of the Term and Conditions of the Retail Licensing Agreement.  Mr. Hansen refused to permit Mr. Liguori to inspect the books and records allegedly because his request was not limited to records regarding sales of souvenirs and because Mr. Liguori demanded access to the records on a day when Mr. Hansen was out of town.

Mr. Hansen also purchased copies of a book, "The Story of Hoover Dam," from author/publisher, Stanley Paher, which had the High Scaler Drawing on the back cover.  (The drawing encompassed the entire back cover.)  Mr. Hansen sold copies of this book in the High Scaler Café.  He did not consider these books to be souvenirs within the meaning of the Retail Licensing Agreement and did not pay royalties to Plaintiffs on their sales.[2]  Mr. Hansen also sold other versions of the book that did not have the High Scaler Drawing on the back cover.

Near the time the Retail Licensing Agreement was executed, Mr. Hansen decided to rename his store the "High Scaler Café."  He testified that he told Mr. Liguori that he intended to hire someone to design a new logo for his store and that Mr. Liguori volunteered to design the logo.  Mr. Liguori created

---

[2] During the second trial the Court held that these books were souvenirs within the meaning of the Retail Licensing Agreement and so instructed the jury.

4

the "High Scaler Drawing" which he provided to Mr. Hansen.  Mr. Hansen considered the drawing a gift.  Mr. Liguori testified, however, that he did not intend to give the drawing to Mr. Hansen, but expected Mr. Hansen to pay him for it.  Mr. Liguori obtained a registered copyright on the "High Scaler Drawing."  Mr. Hansen placed the image of the High Scaler Drawing on the front glass door of the store and on business cards, cash register receipts, menus, plastic shopping bags, and employee hats and uniform shirts.  The image also appeared on labels that were affixed to plastic food containers and plastic bottles of water sold in the store.  Mr. Hansen testified that he did not realize until after the lawsuit was filed that Mr. Liguori had copyrighted the High Scaler Drawing.  However, the copyright legend appeared on some of the souvenirs and other items on which Defendant placed the High Scaler Drawing image.  Mr. Hansen asserted that Mr. Liguori never objected to his use of the High Scaler drawing or demanded payment for it use until after he filed suit in April 2011.

### 2.    Allegations in Plaintiffs' Complaints.

In their original and amended complaints, Plaintiffs alleged that Mr. Liguori informed Mr. Hansen and Mr. Pohe that the cost to create and install the High Scaler monument statue would be approximately $500,000.  Hansen and Pohe[3] suggested that instead of an initial payment of $600,000, Liguori should agree to create and install the monument statue for a fee of approximately $166,000 and that he would be given the opportunity to share in the proceeds of selling merchandise based on the High Scaler sculpture and the "Hoover Dam Series."  Plaintiffs alleged that as a result of these negotiations, the parties entered into the Retail Licensing Agreement.  *Complaint (ECF No. 1)*, ¶¶ 21-23; *First Amended Complaint (ECF No. 78)*, ¶¶ 21-23; and *Second Amended Complaint (ECF No. 298)*, ¶¶ 10-14.  Defendant Hansen denied any such understanding or agreement.  Neither the Monument Agreement nor the Retail Licensing Agreement made any reference to this alleged agreement.  Both agreements contained integration clauses stating the agreement and the attached documents embodied and contained the entire agreement and understandings of the parties.  *Monument Agreement*, ¶ 7. F; *Retail Licensing Agreement*, Terms and Conditions, ¶ 13(e).  Prior to the first trial, the Court granted Defendant's motion to preclude Plaintiffs from introducing evidence regarding this alleged oral understanding or agreement on the basis of the parole evidence rule.

---

[3] Mr. Pohe was not a party to the monument agreement.

1    In their original complaint, Plaintiffs alleged that the Retail Licensing Agreement "licensed to

2    defendants the rights to manufacture and sell souvenirs based on [Liguori's] work in exchange for a

3    17% royalty on all licensed products." *Complaint (ECF No. 1)*, ¶ 1.  It further alleged that Defendants

4    "have manufactured and sold, and continue to sell, a significant volume of souvenirs that utilize

5    [Plaintiff's] works.  Defendants have even used [Liguori's] works in a number of ways that go far

6    beyond the licensed purposes.  For instance, Defendants operate a restaurant known as the 'High Scaler

7    Café' which utilizes [Liguori's] work in its marketing materials, menu, signage, and other items." *Id.*, ¶

8    2.  The original complaint thus appeared to recognize that Defendant's use of the High Scaler Drawing

9    to "brand" his store was outside the scope of the Retail Licensing Agreement.

10    Although Hansen and Pohe were both parties to the Retail Licensee Agreement, they operated

11    separate businesses at Hoover Dam.[4]  The complaint did not distinguish between the alleged breaches

12    of contract committed by Hansen or Pohe, or between their alleged infringements of Plaintiffs'

13    copyrights. The original complaint referred to the copyrights that Plaintiffs had obtained on the High

14    Scaler Sculpture, High Scaler Monument and the High Scaler drawing. *Id.* at ¶¶ 13, 15, and 16. It also

15    referred to other copyrights that Plaintiffs had obtained on sketches and drawings known as the "Hoover

16    Dam Series." *Id.* at ¶¶ 14, 18.  In the third cause of action for copyright infringement, Plaintiffs alleged

17    that "[Hansen] and [Pohe] have caused to be manufactured and sold a number of articles bearing an

18    image which is substantially similar to the High Scaler sculpture and High Scaler drawing." *Id.* at ¶ 49.

19    The copyright infringement claim in the original complaint was arguably limited to these two

20    copyrights, but it was by no means clear.

21    In the first amended complaint filed on March 14, 2013, Plaintiffs alleged that Defendants

22    infringed 39 registered copyrights. *First Amended Complaint (ECF No. 78)*, ¶¶ 7-38.  Three of the

23    copyrights related to the High Scaler Sculpture, the High Scaler Monument and the High Scaler

24    Drawing.  The remainder involved copyrighted works relating to Hoover Dam. *Id.* at ¶¶ 16-19.  The

25    first amended complaint also did not distinguish between copyrights allegedly infringed by Mr. Hansen

26    and those allegedly infringed by Mr. Pohe.  The first amended complaint also alleged claims for breach

27

28
_____

[4] Plaintiffs at one time apparently alleged that Mr. Hansen and Mr. Pohe were business partners.  This allegation was not pursued during either the first or second trials.

1   of contract, tortious breach of contract, breach of the implied covenant of good faith and fair dealing,

2   breach of fiduciary duty, and fraud.  *Id.*  Prior to the first trial, Plaintiffs dropped their claims for

3   tortious breach of contract, breach of fiduciary duty and fraud.  The case proceeded to trial only on

4   Plaintiffs' claims for breach of contract, breach of the implied covenant of good faith and fair dealing,

5   and copyright infringement, and on Mr. Hansen's counterclaim for monies allegedly owed to him.

6           **3.      First Trial.**

7           During the first trial, Plaintiffs presented testimony by an accountant, Annette Carro, regarding

8   the royalty payments that Defendant Hansen allegedly owed Plaintiffs.  Ms. Carro testified that Plaintiff

9   was owed $255,313.31 in royalties for the period from April 2005 through September of 2012.

10  $130,203.50 of that amount was specific to the sale of "High Scaler items," including sales of bottled

11  water which had the High Scaler Drawing on the label.  $125,019.81 represented royalties on the sale of

12  "Hoover Dam" or "HD" items.  No evidence was presented, however, that Mr. Hansen sold "Hoover

13  Dam" souvenirs that incorporated Mr. Liguori's copyrighted drawings or sculptures.  Ms. Carro

14  testified that if the royalties were limited to High Scaler items and did not include the sales of bottled

15  water, the total royalties due to Mr. Liguori were approximately $80,000.  Ms. Carro did not make any

16  deduction for the royalties that were actually paid to Plaintiff.  There was no evidence that Defendant

17  infringed Plaintiffs' High Scaler sculpture or High Scaler monument copyrights, or infringed any of the

18  other copyrights relating to "Hoover Dam."

19          During final argument, Plaintiffs' counsel argued that all of Defendant's net sales revenue from

20  April 1, 2005 through December 1, 2012 were subject to payment of the 17% royalty under the Retail

21  Licensing Agreement.  This argument was based on an overly broad reading of what constituted

22  "Licensed Products" under the Retail Licensing Agreement and on Mr. Hansen's deposition testimony

23  that whenever the image was used, it came under the purview of the agreement.  (Mr. Hansen testified

24  at trial that he intended this statement to refer to souvenir items and not to the sale of food or water

25  products.)  Plaintiffs' counsel thus requested an award of damages for breach of contract in the amount

26  of $3,492,922.63.  In the alternative, Plaintiffs' counsel argued that if the use of the High Scaler image

27  to advertise the store did not come under the purview of the contract, then the jury should award

28  Plaintiffs $130,203.50 in unpaid royalties, plus an additional $9,154.50 in royalties on the sale of the

"Story of Hoover Dam" book.  Under this alternative theory, he also argued that Defendant Hansen willfully infringed Plaintiffs' copyright by using the High Scaler Drawing to "brand" his store, and requested that the jury award the maximum statutory damages of $150,000.00.

The jury returned a verdict in favor of the Plaintiffs for $1,200,000 in damages for breach of contract and $150,000 in statutory damages for copyright infringement.  The breach of contract verdict could only have been based on a finding that Defendant's sales of food and water fell within the scope of the Retail Licensing Agreement.  In granting Defendant's motion for new trial, the Court stated:

> The fact that Mr. Hansen used the High Scaler image to advertise his café or to market his food and water products, including using the image on the labels of those products, cannot reasonably be interpreted to bring the sales of such items within the scope of the Retail Licensing Agreement. Mr. Liguori's testimony that he believed such sales were within the scope of the agreement is purely self-serving and not credible.  There was no evidence that Mr. Liguori ever informed Mr. Hansen of this interpretation of the agreement prior to the filing of the lawsuit.  Moreover, there is no reasonable basis to believe that if Mr. Hansen had been informed of this interpretation, he would have agreed to pay Plaintiffs 17% of the gross revenue from the sale of food and water products for the privilege of using the High Scaler image, and from the remainder left to him, would pay his costs of supply, employee wages and benefits, other overhead costs, and the federal government's share of the business's profits.

*Order (ECF No. 262)*, pg. 17.

The Court also held that the jury's award of $150,000 in statutory damages for copyright infringement was inconsistent with the apparent finding that Defendant's sales of non-souvenir items were within the scope of the Retail Licensing Agreement.  *Id.* at 18-20.

**4.    Second Trial.**

After the grant of a new trial, Plaintiffs filed a second amended complaint in which they alleged claims for breach of contract and breach of the implied covenant of good faith and fair dealing based on Defendant's failure to pay all royalties under the Retail Licensing Agreement.  *Second Amended Complaint (ECF No. 298).*  They also alleged claims for infringement of the copyrights for the High Scaler Sculpture, the High Scaler Monument, and the High Scaler Drawing.

At the second trial, Ms. Carro again testified regarding her calculations of royalty payments due under the Retail Licensing Agreement.  Her calculations this time did not include royalties on any items identified as "Hoover Dam" or "HD."  She also eliminated any royalty calculation for the sale of bottled

8

water.  Ms. Carro did include a calculation of royalties on the sale of the "The Story of Hoover Dam."  Plaintiffs again presented evidence that Defendant Hansen infringed the copyright on the High Scaler Drawing by using it to brand his store.  No evidence was presented to show that Defendant infringed the copyright on the High Scaler Sculpture.  Plaintiffs argued that Defendant Hansen infringed the copyright on the High Scaler Monument based Mr. Liguori's testimony that he saw postcards for sale at the Boulder City Museum that depicted the monument statue.  The Retail Licensing Agreement only authorized Defendant to sell souvenirs at Hoover Dam.  There was no evidence, however, that connected the sale of these postcards to Defendant Hansen and the Court refused to submit the issue of infringement of the copyright of the High Scaler Monument to the jury.

The jury returned a verdict awarding Plaintiffs $47,817.36 in damages for breach of contract.  The jury awarded Plaintiffs $130,000 in statutory damages for copyright infringement.  Judgment in accordance with the jury's verdicts was entered on August 11, 2016.  *(ECF No. 391)*.  Defendant Hansen filed a notice of appeal on September 9, 2016.  *(ECF No. 400)*.  Plaintiffs have not appealed from the jury verdict and judgment in the second trial.  Nor have they appealed from the Court's order granting a new trial.

**DISCUSSION**

**1.    Award of Attorney Fees on Breach of Contract Claim**.

A federal court exercising supplemental jurisdiction over state law claims is bound to apply the substantive law of the forum state to the same extent as if it were exercising diversity jurisdiction.  *Bass v. First Pacific Networks, Inc.*, 219 F.3d 1052, 1055 n. 2 (9th Cir. 2002) (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130 (1966);  *see also Cortez v. Skol*, 776 F.3d 1046, 1054 n. 8 (9th Cir. 2015).  Where the court exercises subject matter jurisdiction over a state law claim, a party may recover attorney's fees under a state law giving a right thereto if the law reflects a substantive policy of the state and does not conflict with a valid federal statute or rule of court.  *MRO Communications v. American Tel. & Tel. Co.*, 197 F.3d 1276, 1281 (9th Cir. 1999)*; see also Walsh v. Kelly*, 203 F.R.D. 597, 598–99 (D.Nev. 2001) (citing *McMahan v. Toto*, 256 F.3d 1120, 1132 (11th Cir. 2001)).  There is no dispute that Nevada law governs the breach of contract claim.  The contract expressly states that it is governed by Nevada law.  *Retail Licensing Agreement*, *Terms and Conditions,*

1    *Section 13(e)*.  Plaintiffs and Defendant are citizens of Nevada and the contract was entered into and

2    performed in Nevada.

3          Under Nevada law, attorneys fees are recoverable in an action arising out of a written instrument

4    or agreement that entitles the prevailing party to an award of reasonable attorney's fees.  Nev. Rev. Stat.

5    § 18.010.4 (2015) ("NRS"); *Semenza v. Caughlin Crafted Homes*, 111 Nev. 1089, 1097–98, 901 P.2d

6    684, 689 (1995); *Davis v. Beling*, 128 Nev. Adv. Op. 28, 278 P.3d 501, 515 (2012) ("Parties are free to

7    provide for attorney fees by express contractual provisions.").  The Retail Licensing Agreement

8    provides for an award of reasonable attorney's fees to the successful or prevailing party in any legal

9    action or proceeding brought to enforce the Retail Licensing Agreement or as a result of a breach,

10    default, or misrepresentation in connection with any of the provisions of the Retail Licensing

11    Agreement.  *Terms and Conditions, Section 13(f)*.

12          **A.  Who is the Prevailing Party?**

13          "The term 'prevailing party' is broadly construed so as to encompass plaintiffs,

14    counterclaimants and defendants."  *Valley Electric Ass'n v. Overfield*, 121 Nev. 7, 106 P.3d 1198, 1200

15    (2005).  The Nevada Supreme Court further states that "[a] party can prevail under NRS 18.010 'if it

16    succeeds on any significant issue in the litigation which achieves some of the benefit it sought in

17    bringing suit.'" *Id.* (quoting *Women's Federal S & L Ass'n v. Nevada Nat. Bank*, 623 F.Supp. 469, 470

18    (D.Nev. 1985)).[5]  Since Plaintiffs obtained a jury verdict and judgment in their favor for breach of

19    contract, it might seem obvious that they are the prevailing parties on that claim.  Defendant Hansen

20    argues, however, that based on the small amount of damages awarded to Plaintiffs in comparison to

21    what they sought and litigated in the action, they cannot be considered the prevailing party.  Defendant

22    argues, instead, that he is the prevailing party and should be awarded his reasonable attorney's fees and

23    costs of suit.  In support of his argument, Defendant relies on *Berkla v. Corel Corp.*, 290 F.3d 983, 994

24

25

26

27       [5] In *Buckhannon Bd. v. West Virginia D.H.H.R.*, 532 U.S. 598, 603, 121 S.Ct. 1835, 1839 (2001) the
Supreme Court stated that "prevailing party" is a legal term of art.  The Court quoted Black's Law Dictionary

28    1145 (7th ed. 1999) which defines "prevailing party" as "'[a] party in whose favor a judgment is rendered,
regardless of the amount of damages awarded.'"  The Court stated that "[t]his view that a 'prevailing party' is
one who has been awarded some relief by the court can be distilled from our prior cases."

1    (9th Cir. 2002).[6]

2         The plaintiff in *Berkla* created image file databases or "nozzles" that "sprayed like paint out of

3    an image hose tool to design realistic illustrations of trees and foliage." 302 F.3d at 913.  The plaintiff

4    contacted the defendant about licensing his designs to the defendant for use in its software products.

5    The plaintiff provided his databases or nozzles to the defendant pursuant to a nondisclosure agreement

6    which obligated the defendant to preserve the confidentiality of the plaintiff's information.  The

7    defendant elected not to enter into a licensing agreement with the plaintiff, and thereafter used the

8    plaintiff's confidential information in creating its own software products.  The jury awarded the

9    plaintiff $23,500 in compensatory damages on his claim for breach of the nondisclosure agreement.  *Id.*

10   at pg. 916.  The plaintiff moved for $526,477 in attorney's fees pursuant to the fee provision in the

11   parties' nondisclosure agreement.  *Id.* at pg. 918.  The district denied the plaintiff's motion for

12   attorney's fees on the grounds that he was not the prevailing party under California law.  *Id.* at 919.

13        In affirming the district court's decision, the Ninth Circuit stated that the plaintiff's motion for

14   attorney's fees was governed by California Civil Code §1717(b) which states that "'[t]he party

15   prevailing on the contract shall be the party who recovered a greater relief in the action on the contract.

16   The court may also determine that there is no party prevailing on the contract for purposes of this

17   section.'" *Berkla*, 302 F.3d at 919.  The district court found that the plaintiff was not the prevailing

18   party under §1717(b) because his "'net recovery was *less than 3% of what he affirmatively sought*

19   *before the jury at trial* . . . .'" *Id.* at 919.  In affirming this determination, the Ninth Circuit quoted from

20   *Hsu v. Abbara*, 9 Cal.4th 863, 39 Cal.Rptr.2d 824, 891 P.2d 804 (1995):

21             [I]n deciding whether there is a "party prevailing on the contract," the
             trial court is to compare the relief awarded on the contract claim or claims
22           with the parties' demands on those same claims and their litigation
             objectives as disclosed by the pleadings, trial briefs, opening statements,
23           and similar sources.  The prevailing party determination is to be made
             only upon final resolution of the contract claims and only by "a
24           comparison of the extent to which each party ha[s] succeeded and failed
             to succeed in its contentions.
25           . . .

26

---

27        [6] As Plaintiffs point out, the decision in *Berkla* at 290 F.3d 983 was withdrawn, amended and superceded
     by *Berkla v. Corel Corp.*, 302 F.3d 909, 912 (2002).  However, the legal analysis on which Defendant relies is
28   the same in the amended decision.  The Court therefore discusses the Ninth Circuit's analysis as set forth in the
     amended decision.

> [W]hile "a plaintiff who obtains all relief requested on the only contract claim in the action must be regarded as the party prevailing on the contract for purposes of attorney's fees under section 1717," . . . a court could also determine that a party is not a prevailing party when it "receives only part of the relief sought." The court emphasized that "in determining litigation success, courts should respect substance rather than form, and to this extent should be guided by equitable considerations."

*Id.* at 920.[7]

California Civil Code § 1717 (b)(1) establishes a specific definition of "prevailing party" for an award of attorney's fees pursuant to a contract provision. In *In re Tobacco Cases I*, 124 Cal.Rptr.3d 352, 360–61 (Cal.App. 2011), the court held that the trial court erred in holding that the plaintiffs prevailed "because they won on a 'significant issue.'" The trial court had relied on *Graciano v. Robinson Ford Sales, Inc.*, 144 Cal.App.4th 140, 153, 50 Cal.Rptr.3d 273 (2006), which applied the same definition of "prevailing party" set forth in *Valley Electric Ass'n v. Overfield*. The court in *In re Tobacco Cases I* stated, however, that *Graciano* "pertains to fees under a statute other than section 1717. (citation omitted). 'The definition of prevailing party is not uniform under California law, and many attorney fees statutes contain a technical definition applicable to the particular statutory scheme.' (citation omitted)." 124 Cal.Rptr.3d at 360.

The Nevada Legislature did not enact a definition of "prevailing party" under NRS 18.010. In interpreting the statute, the Nevada Supreme Court has adopted the generally accepted definition of "prevailing party," as the party who "succeeds on any significant issue in the litigation which achieves some of the benefit it sought in bringing suit." *Valley Electric, supra*, 103 P.3d at 1200; *see also Buckhannon Bd.*, 532 U.S. at 603, 121 S.Ct. at 1839. Because this definition is different than the definition in California Civil Code § 1717 (b)(1), the court's analysis in *Berkla* does not apply here.

Plaintiffs obtained a jury verdict on their breach of contract claim in the amount of $47,817.36. Judgment was entered in accordance with that verdict. Under Nevada law, Plaintiffs are the prevailing party on their breach of contact claim because (1) they obtained a judgment on liability in their favor and (2) they achieved some of the benefit they sought in bringing that claim. Plaintiffs are therefore

---

[7] *Berkla* did not state that the defendant was entitled to an award of attorney's fees as the prevailing party on the breach of contract claim. In *In re Tobacco Cases I*, 124 Cal.Rptr. 352, 361 (Cal.App. 2011), the court, quoting *Hsu*, stated that "'[t]ypically, a determination of no prevailing party results when both parties seek relief, but neither prevails, or when the ostensibly prevailing party receives only part of the relief sought.'"

eligible for an award of attorney's fees on the contract claim.  Defendant is not.

## 2.   Copyright Infringement Claim.

The Copyright Act authorizes the court to award costs and attorney's fees as follows:

> In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof.  Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs.

17 U.S.C. § 505.

In *Fogerty v. Fantasy, Inc.*, the Supreme Court noted that the primary objective of the Copyright Act is not to award the labor of authors, but to promote the progress of science and useful arts.  510 U.S. 517, 534, 114 S.Ct. 1023, 1033 (1994).  In furtherance of that objective, prevailing plaintiffs and prevailing defendants are to be treated alike for purposes of awarding attorney's fees under § 505, "but attorney's fees are to be awarded to the prevailing parties only as a matter of the court's discretion." There is no precise rule or formula for awarding fees.  Instead, the court should exercise equitable discretion "'in light of the considerations we have identified.' Hensley *v. Eckerhart*, 461 U.S. 424, 436-27, 103 S.Ct. 1933, 1941–42, (1983)." *Id.* at 534, 114 S.Ct. at 1033.  The Court noted, in particular, the factors listed in *Lieb v. Topstone Industries, Inc.*, 788 F.2d 151, 156 (3d Cir. 1986) and stated: "We agree that such factors may be used to guide courts' discretion, so long as such factors are faithful to the purpose of the Copyright Act and are applied to prevailing plaintiffs and defendants in an evenhanded manner." *Fogerty*, 510 U.S. at 534 n. 19, 114 S.Ct. at 1033 n. 19.

In *Lieb v. Topstone Industries, Inc.*, the Third Circuit stated that in deciding whether to award attorney's fees to the prevailing party, the district court should consider relevant factors including, but not necessarily limited to, frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case), and the need in particular circumstances to advance considerations of compensation and deterrence.  788 F.2d at 156.  If the court determines that fees should be awarded, it should also consider the following factors in determining the amount of the award:  (1) the complexity of the litigation; (2) the amount of fees actually charged to the client; (3) the relative financial strength of the parties; (3) the amount of damages; and (4) whether the losing party acted in bad faith.  *Id.*

In *Maljack Productions v. Goodtimes Home Video Corp.*, the Ninth Circuit cited the *Lieb*

factors in affirming the district court's award of attorney's fees to the prevailing defendant.  81 F.3d 881, 889 (9th Cir. 1996).  The court appeared to accept the general proposition that the fact that a claim does not survive summary judgment does not mean it was per se objectively unreasonable.  *Id.*  The court affirmed the district court's finding that the plaintiff's copyright infringement claim in that case was objectively unreasonable.  In *Historical Research v. Cabral*, the court stated that "exceptional circumstances" are not required for an award of attorneys and that district courts may freely award attorney's fees so long as they treat prevailing plaintiffs and defendants alike and seek to promote the Copyright Act's objectives.  80 F.3d 377, 378 (9th Cir. 1996).  The court also stated that "[a]lthough willful infringement is an important factor favoring an award of fees, it does not, in itself, compel such an award."  *Id.* at 379 (citation omitted).  In *Gonzalez v. Transfer Technologies, Inc.*, the Seventh Circuit suggested that in copyright cases in which the monetary stakes are small, there should be a presumptive entitlement to an award of attorney's fees to the prevailing party, otherwise minor infringements, though willful, could be committed with impunity.  201 F.3d 608, 610 (7th Cir. 2002).  The court noted that a district court may have good reason to find this presumption rebutted, and, if so, should set forth those reasons in its decision.  *Id.*

In *Countryman Nevada, LLC v. Doe*, the district court stated an award of attorney's fees to a prevailing plaintiff may be denied or reduced if the courts finds that the plaintiff conducted the litigation in a manner calculated to increase the opposing party's costs.  2016 WL 3437598, at *7 (D. Or. June 17, 2016).  The court cited the *Lieb* factors listed in *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 695 F.3d 946, 957 (9th Cir. 2012), *rev'd on other grounds*, — U.S. — , 134 S.Ct. 1962 (2014) and the Supreme Court's recent decision in *Kirstaeng v. John Wiley & Sons, Inc.*, — U.S.— , 136 S.Ct. 1979, 2016 WL 3317564, at *7 (June 16, 2016), which stated that "in any given case a court may award attorneys fees even though the losing party offered reasonable arguments (or conversely, deny fees even though the losing party made unreasonable ones).  For example a court may order fee-shifting because of a party's litigation misconduct, whatever the reasonableness of his claims or defenses."  *Id.* (Emphasis omitted).  The district court in *Countryman* also cited 5 Melville B. Nimmer and David Nimmer, NIMMER ON COPYRIGHT § 14.10[D][1] (2015) which noted that "attorney's fees have been awarded where a party conducted copyright litigation in a manner calculated 'to increase the opposition

party's costs.'" *Id.*  The district court stated that the same principle justifies denying attorney's fees to a prevailing party when that plaintiff conducted litigation in a manner calculated to increase the opposing party's costs.  *Id.*

Here, the jury found that Defendant willfully infringed on Plaintiffs' copyrights and awarded Plaintiffs statutory damages in the amount of $130,000.  Because the jury found Defendant to have willfully infringed on Plaintiff's copyright, the Court finds that awarding Plaintiffs attorneys' fees is appropriate under the Copyright Act.

### 3.    <u>Apportionment of Fee Award</u>

Plaintiffs argue that the Court is not required to apportion the award of fees between the breach of contract and copyright infringement claims because the claims "are so intertwined as to make an apportionment both impossible and unnecessary."  *Motion (ECF No. 393)*, 11:13-14.  Defendant does not refute this argument.  Plaintiffs cite *Unicom Systems Inc. v. Farmers Group, Inc.,* which held that the district court did not abuse its discretion in refusing to apportion the award of fees among several claims that involved a common core of facts and related legal theories.  405 Fed.Appx. 152, 155 (9th Cir. Dec. 2, 2010) (unpublished decision).  Indeed, the Ninth Circuit has held that "apportionment or an attempt at apportionment is required unless the court finds the claims are so inextricably intertwined that even an estimated adjustment would be meaningless."  *Gracie v. Gracie*, 217 F.3d 1060, 1070 (9th Cir. 2000); *see also Hensley*, 461 U.S. at 438, 103 S. Ct. at 1942 (findings that the district court did not err in refusing to apportion the fee award because of the interrelated nature of the facts and legal theories).

Here, the Court finds that apportionment of any fee award is indeed impractical.  Plaintiffs' breach of contract claim and copyright infringement claim arise exclusively from the same set of facts and circumstances.  Any effort made by the Court to decipher what fees should be apportioned to each claim would be meaningless and exceedingly burdensome.

### 4.    <u>Attorneys' Fees Calculation</u>

Having determined that an award of attorneys' fees is appropriate under both the Retail Licensing Agreement and the Copyright Act and that apportioning the fee award is not required in this case, the undersigned now turns to calculating the award of attorneys' fees.  A federal court, sitting in

1    diversity, must apply the state law in determining attorneys' fees.  *Mangold v. Cal. Public Utilities*

2    *Com'n*, 67 F.3d 1470, 1478 (9th Cir. 1995).  In Nevada, a district court has "great discretion to award

3    attorney fees, and this discretion is tempered only by reason and fairness."  *Haley v. Eighth Judicial*

4    *Dist. Ct.*, 128 Nev. Adv. Op. 16, 273 P.3d 855, 860 (2012) (citing *Shuette v. Beazer Homes Holdings*

5    *Corp.*, 121 Nev. 837, 864, 124 P.3d 530, 548–49 (2005)).  "'In determining the amount of fees to

6    award, the [district] court is not limited to one specific approach; its analysis may begin with any

7    method rationally designed to calculate a reasonable amount, so long as the requested amount is

8    reviewed in light of the' *Brunzell* factors."  *Logan v. Abe*, — Nev. —, 350 P.3d 1139, 1143 (2015)

9    (quoting *Haley*, 273 P.3d at860).  The *Brunzell* factors include considering the qualities of the advocate,

10   the character of the work done, the work actually performed by the lawyer and the result.  *Brunzell v.*

11   *Golden Gate National Bank*, 445 P.2d 31, 33 (Nev. 1969).

12        One method a court may employ in calculating attorneys' fees is the lodestar approach.  *See*

13   *Shuette*, 124 P.3d at 549.  The lodestar approach typically proceeds in two steps.  *Gonzalez v. City of*

14   *Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013).  First, courts typically apply "the 'lodestar' method to

15   determine what constitutes a reasonable attorney's fee."  *Id.* at 1202 (citing *Costa v. Comm'r of Soc.*

16   *Security Admin.*, 690 F.3d 1132, 1135 (9th Cir. 2012)).  In applying the lodestar method, the court

17   multiples the number of hours reasonably expended by a reasonable hourly rate.  *Fischer v. SJB-P.D.*

18   *Inc.*, 214 F.3d 1115, 1119 (9th Cir. 2000) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983), *cert.*

19   *denied*, 136 S.Ct. 267 (2015)).  Second, the court may adjust the lodestar upward or downward based

20   on evaluating the *Kerr* factors[8] that are not already subsumed in the initial lodestar calculation.  "Only

21   in rare instances should the lodestar figure be adjusted on the basis of other considerations."  *Morales v.*

22   *City of San Rafael*, 96 F.3d 359, 364 n.8 (9th Cir. 1996).

23        In general, a court must give some indication on how it arrived at a fee award.  *Gates v.*

24   *Deukmejian*, 987 F.2d 1392, 1398 (9th Cir. 1992).  In complex cases, where a voluminous fee

25

26        [8] The *Kerr* factors contemplated by the Ninth Circuit include: (1) the time and labor required, (2) the novelty and
     difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other

27   employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent,
     (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the

28   experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the
     professional relationship with the client, and (12) awards in similar cases.  *Kerr v. Screen Guild Extras, Inc.*, 526 F.2d 67, 70
     (9th Cir. 1975).

application is filed, the district court does not need to set forth an hour-by-hour analysis of the fee request. *Id.* at 1399. Instead, "when faced with a massive fee application the district court has the authority to make across-the-board percentage cuts either in the number of hours claimed or in the final lodestar figure 'as a practical means of trimming the fat from a fee application.'" *Id.* (quoting *New York State Ass'n for Retarded Children v. Carey*, 711 F.2d 1136, 1146 (2d Cir. 1983)). Indeed, percentages are acceptable, and at times necessary, tools for the district court to use when fashioning reasonable fee awards. *Id.* at 1400. Specifically, if a district court cannot tell by a cursory examination which hours are unnecessarily duplicative, it may impose a small reduction, no greater than 10 percent—a "haircut"— based on its exercise of discretion and without a more specific explanation. *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008). Any reduction larger than 10 percent however requires a "concise but clear" explanation for why the district court chose that percentage. *Gates*, 987 F.2d at 1398.

### a. Hourly Rates

A district court has the duty to ensure that the attorney's rate reflects the prevailing market rates of attorney's practicing in the relevant community. *See Dang v. Cross*, 422 F.3d 800, 813 (9th Cir. 2005). "Generally, when determining a reasonable hourly rate, the relevant community is the forum in which the district court sits." *Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 454 (9th Cir. 2010) (internal quotation marks omitted). The district court has discretion to reduce an attorney's rates so that it is "'in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.'" *Chaudhry v. City of L.A.*, 751 F.3d 1096, 1110 (9th Cir. 2014) (quoting *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 978 (9th Cir. 2008)). "Importantly, the fee applicant has the burden of producing 'satisfactory evidence' that the rates he requests meet these standards." *Gonzalez*, 729 F.3d at 1206.

"Rate determinations in other cases in the District of Nevada have found hourly rates as much as $450 for partners and $250 for an experienced associate to be the prevailing market rate in this forum." *Perrigo v. Premium Asset Servs., LLC*, 2015 WL 4597569, *10 (D. Nev. July 28, 2015); *see also CLM Partners LLC v. Fiesta Palms, LLC*, 2013 WL 6388760, *5 (D. Nev. Dec. 5, 2013) (refusing to calculate hourly rates between $650 and $400 for attorneys working "for a law firm with an excellent

reputation," and instead calculating lodestar at hourly rate of $450 for partner and $250 for experienced associates).  Other Courts in this district have awarded rates as low as $268 for partners.  *Home Gambling Network, Inc. v. Piche*, 2015 WL 1734928, *10–11 (D. Nev. Apr. 16, 2015).  In complex matters, a rate of $400 per hour has been described as "at the top of the market," but reasonable.  *Marrocco v. Hill,* 291 F.R.D 586, 589 (D. Nev. 2013) (finding the reasonable hourly rate in the Nevada community to be $375-$400 for partner with over thirty-five years of experience).  In addition, courts in this district have found reasonable hourly rates of $75 to $125 for paralegals and law clerks.  *See Crusher Designs, LLC v. Atlas Copco Powercrusher GmbH*, 2015 WL 6163443, *2 (D. Nev. Oct. 20, 2015) ("As for very experienced paralegals, the prevailing rate is in the range of $125"); *see also Dossat v. Hoffman-La Roche Inc.*, No., 2012 WL 5287956, at *7 (D. Nev. Oct. 24, 2012)*, aff'd sub nom. Dossat v. F. Hoffmann-La Roche Ltd.*, 600 F. App'x 513 (9th Cir. 2015) (finding a reasonable hourly rate of $75 for paralegals and law clerks); *Jackson v. United Artists Theatre Circuit, Inc.*, 2012 WL 117546, at *2 (D. Nev. Jan. 13, 2012) (finding $95 to be a reasonable hourly rate for a law clerk).

"Affidavits of the plaintiffs' attorney and other attorneys regarding prevailing fees in the community, and rate determinations in other cases, particularly those setting a rate for the plaintiffs' attorney, are satisfactory evidence of the prevailing market rate."  *Beauchamp v. Anaheim Union High Sch. Dist.*, 816 F.3d 1216, 1224 (9th Cir. 2016) (quoting *United Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990)).  However, declarations of the fee applicant do not conclusively establish the prevailing market rate.  *Camacho*, 523 F.3d at 980.  "Ideally, a court should consider counsels' affidavits including information about fee rates of other attorneys in similar practices, awards in comparable cases, counsel's experience and reputation level, and market rates."  *Roadhouse v. Patenaude & Felix, A.P.C.*, 2016 WL 5791544, at *4 (D. Nev. Sept. 30, 2016) (citing *Dang v. Cross*, 422 F.3d 800, 814 (9th Cir. 2005)).

Here, Plaintiffs request the following hourly rates: $400 per hour for senior partners; $315 per hour for senior associates and junior partners; $290 per hour for all other associates; $125 per hour for paralegals; and $95 per hour for law clerks.  *Motion* (ECF No. 393), pg. 15 and *Declaration of Todd Moody* (ECF No. 393-1), pg. 3.  Plaintiffs seek reimbursement at these hourly rates for three (3) senior partners, one (1) senior associate/junior partner, seven (7) associates, two (2) paralegals, and six (6) law

clerks.  Plaintiffs' provided Todd Moody's declaration as evidence that the rates charged are reasonable.  Defendant, however, contends that the hourly rates requested by Plaintiffs should be reduced because they "[have] not produced satisfactory evidence to demonstrate that these rates, or the number of attorneys assigned to the case, are in line with the prevailing standard in the community."  *Opposition* (ECF No. 402), 16:12-14.  Based on the Court's knowledge of the standard hourly rates for attorneys, paralegals and law clerks with comparable experience, skill, and reputation, the Court finds that Plaintiffs' requested hourly rates are reasonable.  In addition, Defendant's argument regarding the number of individuals assigned to this matter is not relevant to the Court's hourly rate analysis.

### b.    Hours Reasonably Expended

In addition to providing evidence to support the requested hourly rates, a fee applicant must provide a reasonable itemization and description of the work performed.  *See* LR 54-14.  If the court finds that any hours were not reasonably expended, the court should exclude those from the initial fee calculation.  *Hensley*, 461 U.S. at 433–34 (citation omitted).  In other words, the court has discretion to "trim fat" from, or otherwise reduce, the number of hours claimed to have been spent on the case. *Edwards v. Nat'l Bus. Factors, Inc.*, 897 F.Supp. 458, 460 (D. Nev. 1995) (citation omitted); *see also Gates*, 987 F.2d at 1399.  If a party opposes a fee award, it must present "specific reasons for reducing the fee request that the district court finds persuasive"; otherwise, the court "should normally grant the award in full, or with no more than a haircut."  *Moreno*, 534 F.3d at 1116.

Billed time that includes unnecessary duplication of effort should be excluded from the lodestar. *Herrington v. County of Sonoma*, 883 F.2d 739, 747 (9th Cir. 1989); *see also Marrocco*, 291 F.R.D. at 589.  In addition, "courts ought to examine with skepticism claims that several lawyers were needed to perform a task, and should deny compensation for such needless duplication as when three lawyers appear for a hearing when one would do."  *Democratic Party of Wash. State v. Reed*, 388 F.3d 1281, 1286 (9th Cir. 2004) (internal citations omitted).  Of course, some duplication of effort is necessary in any case and the mere fact that there is some duplication does not necessarily justify reducing the hours expended.  *Moreno*, 534 F.3d at 1112.

Here, Plaintiffs' counsel submitted a sufficient memorandum of attorneys' fees and costs that complies with LR 54-14.  (*See* ECF No. 394).  Defendant contends, however, that Plaintiffs' requested

fees and costs are "exorbitant and unreasonable." *Response* (ECF No. 402), 9:11.  Defendant argues the following: (1) Jacob Reynold's departure from Hutchinson & Steffen on the eve of trial necessitated duplicative work, (2) this was Ava Bessel's first case which resulted in over-billing, (3) this case was taken on a contingent fee basis so there was no ongoing monitoring of the time and expenses billed, (4) the need to add Kumen Taylor and Richard Wade to the case created unnecessary duplication of effort, (5) the need to have three attorneys attend and try the case was unnecessary, (6) Hutchinson & Steffen bloated its hours by seeking reimbursement for reviewing its own bills, (7) Hutchinson & Steffen only made marginal reductions to what they have attributed to the claims related solely to Kawana Pohe, (8) there is a lack of significant documentation by the attorneys that led to massive amounts of duplication, (9) the disparity between the fee requests is telling (Defendant only seeks $290,000 and Plaintiffs request approximately $970,000), (10) the fact that this case was taken on a contingency basis undermines the credibility of the fee request, and (11) this case did not present novel or difficult issues; nor did it require unusual skill to prosecute. *See id.* at pgs. 9-16.

Plaintiffs argue that their substantial fee request and hours expended are not unreasonable.  They assert that the fees and hours are in fact reasonable because Plaintiffs had to litigate this case over the course of five years due to discovery disputes caused by Defendant, that this case proceeded in two separate trials that required two separate strategies, that this case involved thousands of pages of documents, and that this case was not just a simple contract and copyright dispute. *Reply* (ECF No. 406), at 3.  Plaintiffs also assert that the "contingency fee nature of the case does not undermine the credibility of the fee request, but rather shed light on the risk current counsel accepted by entering the case." *Id.* at 5:1-2.

According to Plaintiffs' counsel's itemized billing records and statement of costs, Plaintiffs' counsel billed for 3,520.40 hours of attorney, paralegal and law clerk time amounting to $955,132.  Plaintiffs' counsel also added $47,169 in attorneys' fees from Holland & Hart, $2,020 in attorneys' fees from Phil Kantor, and $1,000 in attorneys' fees from Ryan Alexander for a total of $1,005,321 in attorneys' fees.  Plaintiffs' counsel deducted $34,205.50 for fees and costs related to Plaintiffs' claims against Kawana Pohe and for fees related to attempting to collect their judgment prior to the order granting new trial.  Therefore, Plaintiffs' counsel requests reimbursement for attorneys' fees in the total

1  amount of $970,882.50.   Based on the Court's review, however, a significant amount of time billed

2  appears to be duplicative and it will exercise its discretion to apply a modest across the board 10%

3  reduction of Plaintiffs' requested fees.  This results in an initial fee reduction of $97,088.25.

4         Second, Plaintiffs are not entitled to an award of attorneys fees associated with the first trial in

5  this case, which according to Plaintiffs' counsel's billing records totals approximately $349,844.[9]

6  Although Plaintiffs obtained verdicts and a judgment in their favor as a result of the first trial, those

7  verdicts and judgment were set aside and a new trial was granted because of Plaintiffs' overreaching

8  and invalid arguments with respect to their breach of contract claim.  Specifically, during final

9  argument Plaintiffs' counsel requested an award of $3.5 million in breach of contract damages based on

10 an unreasonable interpretation of the Retail Licensing Agreement, which was also contrary to the

11 allegations in Plaintiffs' original complaint.  It was also contrary to Plaintiffs' argument prior to the first

12 trial that there was an agreement that Plaintiffs would be able to recoup the $500,000 cost of the

13 monument through royalties on the sale of souvenirs.  Because the second trial was necessitated by

14 Plaintiffs' counsel's improper conduct in the first trial, the Court will reduce Plaintiffs' attorneys' fees

15 request by $349,844.

16        The Court also finds that additional reductions should be made to Plaintiffs' attorneys' fees

17 award.  Plaintiffs acknowledge that fees associated with litigating this matter against Co-Defendant

18 Kawana Pohe should not be awarded.  However, they only reduced their requested fees by $2,048.  The

19 Court understands that there is probably no clear cut way to distinguish the attorney hours attributable

20 to pursuing the claims against Defendant Pohe from those against Defendant Hansen.  A reduction of

21 only $2,048, however, appears to be grossly inadequate.  More importantly, the Court finds that a

22 substantial reduction in the fees should be made based on the "amount involved and the results

23 obtained."  *See Women's Federal S & L Ass'n v. Nevada Nat. Bank*, 623 F.Supp. at 471 (court reduced

24 award based on the limited relief obtained in comparison to the scope of the litigation).  If Plaintiffs and

25 their counsel had pursued this case in light of the breach of contract and statutory copyright

26 infringement claims on which they had a reasonable possibility of success, they would have devoted far

27 

28     [9] This amount reflects time spent by Plaintiffs' counsel from approximately April 17, 2014 through September 21, 2015, which the Court determined was largely dedicated to preparing for and conducting the first trial, and also to post-trial motions and briefing relating thereto.

less attorney effort and hours to achieve such a result.  Plaintiffs and their counsel, however, attempted to make this case into a far larger claim than it legitimately was.  As indicated above, they claimed that they were entitled to recoup the alleged value of the monument statue under the Retail Licensing Agreement even though there was no basis for such a claim in the contracts.  When this failed, they alleged that they were entitled to a 17 % royalty on all of Defendant's gross sales.  Plaintiffs also alleged that Defendant infringed numerous copyrights, but only proved the infringement of one copyright.  In the end, Plaintiffs obtained a total judgment in the amount of $177,817.36. The Court also recognizes that Defendant contested any liability to Plaintiffs for either breach of contract or copyright infringement, and it was necessary for Plaintiffs to litigate this case through trial and judgment.  Based on all of the circumstances, the Court concludes that a further reduction of fees in the amount of $168,315.53 is warranted.  The Court therefore concludes that Plaintiffs are entitled reasonable attorneys' fees in the total amount of $355,634.72.

### c.  Reasonable Costs

According to Plaintiffs' counsel's memorandum of fees and costs, Plaintiffs request reimbursement for costs associated with this case in the amount of $66,164.89.  For the reasons stated above, Plaintiffs are not entitled to recover costs associated with the first trial. The following costs will therefore be deducted:  (1) $156.53 in meal costs, (2) $215 in parking costs, (3) $2,680.62 in legal research (this number includes the amount expended approximately ninety (90) days before the first trial), (4) $1,745.45 in transcript costs (includes charges incurred in obtaining transcripts from the first trial), (5) $38.22 in secretarial overtime (this amount should be accounted for in Plaintiffs' counsel's

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

requested attorneys' fees) and (6) $7,610 in expert witness fees (this represents a 25% reduction of Plaintiffs' expert's fees).[10]  This results in a combined deduction of $12,445.82 in costs.  Plaintiffs are awarded costs of $53,719.07.

## CONCLUSION

Based on a consideration of all relevant factors,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Attorney's Fees and Nontaxable Costs (ECF No. 393) is **granted.**   Plaintiffs are awarded $355,634.72 in attorneys' fees and $53,719.07 in costs for a total award of $409,353.79.

**IT IS FURTHER ORDERED** that Defendant's Motion for Attorney's Fees and Nontaxable Costs (ECF No. 392) is **denied**.

DATED this 15th day of February, 2017.

GEORGE FOLEY, JR.
United States Magistrate Judge

---

[10] The Court determined that a 25% reduction in Plaintiffs' expert's witness fees is appropriate due to the fact that Plaintiffs failed to provide clear evidence in the memorandum of fees and costs regarding what hours Plaintiffs' expert expended on the first trial versus the second trial.